IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA

      v.                                Case No. 13-cr-84-jdp

SINOVEL WIND GROUP CO., LTD.,
                Defendant.

---

## GOVERNMENT SENTENCING MEMORANDUM

---

There are five primary issues to decide at Sinovel's July 6, 2018 sentencing.

Four were expected, one is new.    The expected four issues are:

(1)    Whether AMSC and the Massachusetts Turbine Owners are victims?

(2)    What are these victims' losses under USSG § 2B1.1?

(3)    What victim losses are compensable under 18 U.S.C. § 3663A?

(4)    Should the Court permit Sinovel to thwart and delay paying the restitution

and fine through the appeal process or should the Court direct Sinovel to escrow the

full amount of restitution and fine under Fed. R. Crim. P. 38(c)(1) and (e)(2)(C) pending

the appeal outcome?

The fifth issue stems from a recent John Wang interview (attached), showing that

Sinovel understated its available cash reserves to the presentence report writer, and by

extension to the Court, by a whopping $95,038,388.72.    The sentencing issue is whether

the lie constitutes an obstruction of justice under USSG § 3C1.1 (an attempt to impede

the administration of justice with respect to sentencing) or whether, given the fine

amount cap of $1.5 million, the Court should disregard the lie for purposes of the

guideline calculations and simply chalk up the $95 million understatement as yet

another example of Sinovel's sneakiness and greed.

**ARGUMENT**

## I.      The Victims

Under federal law, the "term 'crime victim' means a person directly and

proximately harmed as a result of the commission of a Federal offense . . . . "   (18 U.S.C.

§ 3771(e); *see also* USSG § 2B1.1, comment. (n. 1) "'Victim' means … any person who

sustained any part of the actual loss determined under (b)(1) . . . .  'Person'

includes . . . corporations . . . . ").

Under the Mandatory Victim Restitution Act (MVRA), "the term 'victim' means

a person directly and proximately harmed as a result of the commission of an offense

for which restitution may be ordered including, in the case of an offense that involves as

an element a scheme, conspiracy, or pattern of criminal activity, any person directly

harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or

pattern."   18 U.S.C. § 3663A(a)(2).   Organizations—like AMSC and the several

Massachusetts turbine businesses—are "persons" under federal criminal law.   *See* 18

U.S.C. § 18.

The primary victim is AMSC.   *See* the superseding indictment, R. 332, and the

trial testimony of the current and former AMSC employees, but especially David Henry

(R. 474, pp. 91-113), who summarized the monetary losses, and Susan DiCecco. (R. 462,

pp. 101-144), who summarized the human costs.

The secondary victims are the several Massachusetts turbine entities and their

owners, Gordon Deane and Sumul Shah.   Deane, Shah, and their entities—collectively,

2

the Massachusetts turbine owners—unambiguously sustained losses because of Sinovel's conduct "in the course of the scheme, conspiracy, or pattern." Sinovel sold Deane and Shah four turbines, erected in Charlestown, Scituate, and Fairhaven, Massachusetts. As alleged in the conspiracy count, Sinovel copied software derived from the stolen trade secrets into the Massachusetts turbines. (R. 332, p. 9). That allegation is also incorporated into the trade secret and wire fraud counts. (*Id.*, pp. 10-11). On September 26, 2011, one month before the Charlestown turbine was commissioned, Sinovel lied to Deane and Shah, denying AMSC's intellectual property theft claims and claiming that it had independently developed the LVRT solution (Gov. Ex. 25A, pp. 4-5). Sinovel had agreed to long-term maintenance agreements—to include supplying spare parts—for all of the Massachusetts turbines. In 2013, however, Sinovel fled from the United States in an attempt to avoid facing prosecution, abandoning the turbine contracts and the Massachusetts turbine owners. (PSR ¶¶ 49-58).

## II.    USSG § 2B1.1 Loss Amounts

Under USSG § 2B1.1, comment. (n. 3), the general rule is that loss is the greater of the actual or intended loss. "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense." (*Id.*) "Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur. (*Id.*)

The Court must make a "reasonable estimate" of loss (USSG § 2B1.1, comment. (n. 3(C)) by a preponderance of the evidence, based on the conduct of conviction and all relevant conduct. *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013); *United States*

*v. Locke*, 643 F.3d 235, 243 (7th Cir. 2011) (USSG § 2B1.1 guideline loss is based on the count of conviction and "acts that were part of the same course of conduct or common scheme or plan as the offense of conviction.") (Internal quotations omitted). The Court estimates loss "based on available information, taking into account, as appropriate and practicable," among other things, the following:

(i)     The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

(ii)    In the case of proprietary information (*e.g.*, trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense.

USSG § 2B1.1, comment (n. 3). The defendant's gain from an offense should be used 'as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.'" *United States v. Dokich*, 614 F.3d 314, 320 (7th Cir. 2010).

     a.     **AMSC Losses**

Sinovel wrongly argues that this is solely a "trade secret case" and, as such, AMSC's losses are limited to the trade secret development costs. (*See* R. 487, pp. 2-6, and 10, citing *United States v. Pu*, 814 F.3d 818, 826 (7th Cir. 2016) and USSG § 2B1.1, comment. (n. 3(C)(ii)). Sinovel also argues that the AMSC loss calculation in the PSR is "not tethered" to the charges of conviction. (R. 487, p. 2). Sinovel is wrong in three respects.

First, while the jury found Sinovel guilty of trade secret theft (Count 2, 18 U.S.C. § 1832), it also found Sinovel guilty of conspiracy to commit trade secret theft and criminal copyright infringement (Count 1, 18 U.S.C. §§ 371 and 2319, and 17 U.S.C. § 506) and wire fraud (Count 3, 18 U.S.C. § 1343). The full measure of the economic

4

harm caused by Sinovel's several crimes—and the broader scheme to defraud—is now at issue.

Second, as noted above, loss is determined based both on the offenses of conviction and relevant conduct. *Orillo*, 733 F.3d at 244 and *Locke*, 643 F.3d at 243.

Third, in contrast to the case at hand, in *Pu*, the case that Sinovel relies on, there the defendant never used the stolen information. *See Pu*, 814 F.3d at 822 and 824. It follows that, in *Pu*, there was no reduction in the trade secret value and thus no loss. In *Pu*, the Seventh Circuit found that, in the absence of an actual loss to the victim, the correct measure would be the trade secret development cost if that is what the defendant intended to take. (*Id.*, at 826). Here, the Court is not limited to the amount of loss Sinovel intended to impose on AMSC (although we know that was significant based on Karabasevic's skype messages and emails), because the Court can reasonably estimate AMSC's actual loss.

Moreover, Sinovel, in arguing that the development cost is the exclusive measure of loss, ignores half of the relevant guideline application note. When estimating loss, the Court can consider among other factors, "[i]n the case of proprietary information (e.g., trade secrets), the cost of developing that information <u>or the reduction in the value of that information that resulted from the offense</u>." USSG § 2B1.1, comment. (n. 3(C)(ii)) (emphasis added). The Coca-Cola trade secret—its recipe—came up during the trial (R. 477, 54-56) and is useful to illustrate the conspicuous flaw in Sinovel's loss argument. At $56.7 billion, Coca-Cola is one of the world's most valuable brands.[1]

---

1  https://www.forbes.com/pictures/591c87fc31358e03e5593101/5-coca-cola/#c759f62627d1

Under Sinovel's view, if the Coca-Cola recipe were stolen and used, Col. John Pemberton's development costs, circa 1886,[2] would be the sole measure of USSG § 2B1.1 loss. While development costs could be a way to estimate loss under USSG § 2B1.1, Sinovel is wrong to suggest that it is the only measure.

As reflected in the presentence report, AMSC suggests several ways for the Court to estimate the reduction in value for its intellectual property after Sinovel executed the scheme—through Karabasevic, Su, and Zhao—to defraud AMSC of its intellectual property. (PSR ¶¶ 23-33). The Court may reasonably estimate the reduction in value of AMSC's intellectual property when Sinovel used the software derived from the stolen trade secrets in cheaper replacement electrical components, to upgrade existing turbines, to avoid paying its existing debts to AMSC, and to breach its AMSC contracts.

Before addressing AMSC's reasonable loss calculations, it is appropriate to note that the Court may rely on well-supported information in the presentence report. *See United States v. Scalzo*, 764 F.3d 739, 745 (7th Cir. 2014). AMSC's presentence report loss claims are supported by the Skype and email statements of Sinovel's agent Karabasevic (collected at Gov. Ex. 9, the composite communications binder) and by the testimony of David Henry (R. 474, pp. 91-113), Susan DiCecco (R. 462, pp. 101-144), and Jian (John) Wang (R. 463, pp. 31-83). Sinovel "bears the burden of showing that the PSR is inaccurate or unreliable, and a simple denial of its accuracy does not discharge this burden." *See Scalzo*, 764 F.3d at 745. Sinovel has done nothing to show that the loss information in the PSR is inaccurate or unreliable. Instead, Sinovel has simply

---

2  https://en.wikipedia.org/wiki/Coca-Cola#19th-century_historical_origins

repeated the defense necessarily rejected by the jury (*see* PSR ¶¶ 34-39) and ignored the fact that it must be sentenced, not merely for trade secret theft, but for the conspiracy, the scheme to defraud, and all relevant conduct.    (R. 487).

Turing now to AMSC's losses under USSG § 2B1.1.    As shown during the trial—and found by the jury—AMSC's intellectual property derived independent economic value from the fact it was secret.    (*See* Post Trial Jury Instructions, R. 451, p. 9). Although Sinovel's debt to AMSC grew before the crime was discovered, as long as the intellectual property was secret, AMSC retained leverage requiring Sinovel to pay its outstanding debt.    The debt was $108,700,000 on March 31, 2011.    (PSR ¶ 27). AMSC's leverage and ability to collect disappeared when Sinovel stole the intellectual property.    David Henry testified that Sinovel paid nothing on this amount after the theft.    (R. 474, p. 108).    The outstanding debt is properly included in the § 2B1.1 loss calculation where, but for its crimes, Sinovel would have needed AMSC and thus would have had to pay its debt.

Similarly, but for its crimes, Sinovel would have had to accept delivery of the $68,200,000 in electrical components that it had contracted for and that AMSC attempted to deliver on March 31, 2011 (*see* PSR ¶ 28), because AMSC's software was designed not to work on substitute components.    This amount is also properly included in the § 2B1.1 loss calculation.

Further, Sinovel entered multiple long-term component contracts with AMSC to purchase the electrical components into which the intellectual property was incorporated.    (*See* Gov. Ex. 22B, March 11, 2010; Gov. Ex. 22C, May 10. 2010—for 7,200 "core component" sets; Gov. Ex. 22D, November 5, 2010; and Gov. Ex. 22E, January 27,

2011—about a month before Sinovel's March 7, 2011 theft through Karabasevic).

AMSC would have realized a $296,200,000 profit on all its Sinovel contracts. (PSR ¶ 29). Importantly, as the contract dates show, Sinovel continued to enter into contracts during the fraudulent scheme. The contracts opened AMSC to both opportunity and vulnerability. As noted below, AMSC purchased raw materials and inventory to comply with the contracts. The chance that Sinovel would abide by its agreements kept AMSC working to make Sinovel successful after the theft, but before the crimes were discovered.[3]

The contract damages were not just reasonably foreseeable: Sinovel actually foresaw them. (*See*, *e.g.*, Gov. Ex. 3K53 ("it goes to billions at the end").) Thus, the lost profit is appropriate to include in the loss calculus. After Sinovel's scheme to defraud and intellectual property theft for use in cheaper components,[4] it reneged on the AMSC contracts. The lost profit that AMSC would have realized based on its Sinovel contracts accurately reflects a significant component of the "the reduction in value of the information" resulting from Sinovel's crime.

---

[3] Recall Gov. Ex. 24Q, Su's duplicitous April 13, 2011 email requesting that AMSC personnel continue to help with the 3 Megawatt Turbine LVRT test. After pleading for AMSC's help with CEPRI testing, Su wrote, "Let's work together to achieve a wonderful goal in 3MW LVRT certification."

[4] Recall, for example, Gov. Ex. 3K34, an April 23, 2011 Skype, where Karabasevic states that Zhao advised him that Sinovel would stop doing business with AMSC and would use Chinese-made replacement components. Also recall Gov. Ex. 3K53, a May 14, 2011 Skype where Karabasevic states that, through him, Sinovel will use cheaper component suppliers, achieve "independency" from AMSC, and upgrade 5,000 wind turbines. AMSC's loss and Sinovel's gain, Karabasevic wrote, "goes to billions in the end." (Gov. Ex. 3K53, p. 2).

One arrives at the same number from another perspective supported by the § 2B1.1 commentary. Where the sentencing court cannot reasonably determine a category of victim loss, "the court shall use the gain that resulted from the offense as an alternative measure of loss." USSG § 2B1.1 comment. (n. 3(B)); *see also United States v. Giovenco*, 773 F.3d 866, 871 (7th Cir. 2014) (finding that the guideline calculation was appropriate whether one evaluated loss based on the victim's expenditures or the defendant's gain). Because Sinovel stole AMSC's intellectual property, it was able to use cheaper knock off components and pocket the contractual profits AMSC would have earned. Either way one looks at it—AMSC's loss or Sinovel's gain—the $296,200,000 contractual profits are properly included in the § 2B1.1 loss calculation.

Next, as noted in the presentence report, AMSC purchased $24,200,000 in inventory and raw materials to fulfill its contractual obligations to Sinovel. (PSR ¶ 30). Further, as explained at trial, AMSC had to pay suppliers $40,300,000 to get out of non-cancellable contracts after Sinovel reneged. (R. 474, pp. 112-13). Because Sinovel reasonably foresaw that AMSC would make purchases and enter into third-party agreements so that AMSC could follow through on its contractual commitments to Sinovel, these amounts are properly included in AMSC's § 2B1.1 losses.

Under Seventh Circuit law, AMSC's Chinese legal expenses *should not* be included in the loss amount. *See United States v. Seward,* 272 F.3d 831, 839 (7th Cir. 2001) ("Attorney's fees incurred in fighting a fraudulent scheme are . . . consequential, not direct damages" and are thus not included in the § 2B1.1 loss calculations).

In contrast, AMSC's $300,000 legal fees associated with the criminal prosecution *should* be included as these fees were not to aid the government—which would be

excluded from the loss totals (§ 2B1.1, comment. (n. 3(D)(ii))—nor were they incurred litigating the fraud.    Instead, these costs but were incurred responding to Sinovel's burdensome subpoenas and motions to compel.    U.S. Magistrate Judge Crocker's October 20, 2017 order recounts the subpoena dispute and AMSC's efforts to comply with Sinovel's demands.    (R. 342).

Because Sinovel cannot be prevented from continuing to use AMSC's intellectual property, AMSC suggests three ways (at PSR ¶ 33) to evaluate the ongoing "reduction in the value of [its intellectual property] that resulted from the offense."    (*See* § 2B1.1, comment.    (n. 3(C)(ii)).    All three yield a reasonable loss estimate under § 2B1.1. Sinovel complains that the first two, the "lost IP value" approach and the "lost gross margin" approach, are flawed because Sinovel suffered market loss and could not have continued to purchase electrical components at the scale and prices that these approaches assume.    (R. 487, p. 2).    The central problem with Sinovel's argument on this point is that much of the harm it suffered resulted from its crimes.    The facts show that Sinovel's crime harmed both AMSC and Sinovel.    Sinovel's crimes came almost immediately to public light[5] and it had to abandon lucrative overseas markets in its bid to avoid service of process.[6]    The disclosures surely had an impact on Sinovel's ability to sell wind turbines that were dependent on stolen software to work.    Sinovel's own factual assertions support this conclusion.    Sinovel writes, "from 2011 through 2017 Sinovel experienced a dramatic reversal of fortune and decline.    Sinovel fell from being

_____

5
http://archive.boston.com/business/articles/2011/09/24/engineer_guilty_in_software_theft/

6  http://www.eco-business.com/news/sinovel-divest-overseas-units/

the leader of the Chinese wind turbine market with more than 25% of market share in 2009 to being outside the top ten with less than 3% of market share in 2015." (R. 487, p. 2.) Sinovel's statement demonstrates that, far from being a whole market decline in wind turbine sales, the decline was peculiar to Sinovel—Sinovel's economic fortunes fell relative to other Chinese wind carriers, not in conjunction with a broader decline. Sinovel provides no facts showing that its decline was unrelated to the criminal investigation and prosecution that unfolded precisely during that period, from 2011-2017. Thus, in the absence of the crime, AMSC could have expected Sinovel's performance to continue. Put another way, Sinovel caused the decline in its performance through its crimes, and it cannot discount AMSC's lost profits because of its own market share loss.

Regardless whether Sinovel could or would have continued to purchase electrical components beyond the amounts it contracted for, the "lost market value" approach is both sound and comprehensive. (*See* last bullet point at PSR ¶ 33). As shown in Karabasevic's gloating communications (*see*, *e.g.*, Gov. Ex. 3K32, pp. 1-2), AMSC's stock value declined precipitously after Sinovel reneged on its contracts and refused shipment of AMSC components. Attorney Samia reports that the stock value slid $525 million in one day after Sinovel reneged on the AMSC contracts. As would come to light over the next year, Sinovel's ability to renege and refuse the shipments stemmed from its theft of AMSC's intellectual property. Because the decline in AMSC's stock value resulted from the theft of its intellectual property, that decline-- $1,063,945,962 (*see* PSR ¶ 33) is a reasonable estimate of the loss in value of the intellectual property. This analysis is consistent with § 2B1.1, comment. (n. 3(C)(ii))

(the reduction in the value of the intellectual property resulting from Sinovel's crimes) and with § 2B1.1, comment. (n. 3(C)(i)) (evaluating the fair market value of the property).   In addition, USSG § 2B1.1 note 3(C)(v) specifically approves using equity loss to estimate victim loss ("the reduction that resulted from the offense in the value of equity securities or other corporate assets").

Importantly, the stock market decline figure is a *comprehensiv*e, reasonable estimate of AMSC's loss.   In other words, one would not add AMSC's lost profits, losses related to raw materials and purchased inventory, and so on, on top of the market value decline because these several categories of loss—all triggered by Sinovel's crimes—figure into AMSC's market decline.[7]

### b.    Losses Incurred by Massachusetts Turbine Purchasers

Gordon Deane, Sumul Shah, and their companies (the Massachusetts turbine owners) are victims under § 2B1.1, comment. (n. 1) and sustained losses under § 2B1.1, comment.   (n. 3).   With two exceptions, addressed below, the Massachusetts turbine owners' losses described at PSR ¶¶ 49-58 should be included in the loss calculation. The Massachusetts turbine owners suffered losses because of Sinovel's crimes in two ways.   First, Sinovel lied to Deane and Shah claiming that it had created the stolen intellectual property.   (Gov. Ex. 25A, pp. 4-5; and R. 470, pp. 59-62, Sumul Shah trial testimony regarding Sinovel false statement).   Relying on Sinovel's lies, the Massachusetts turbine owners erected Sinovel turbines in Charlestown, Scituate, and Fairhaven.   Second, like a pedestrian sideswiped by a fleeing bank robber, the

---

[7] Sinovel continues to point to the "insider trading" proceeding as an outside influence on AMSC's stock market price (R. 487, pp. 8-9) but, as previously established, the insider trading proceeding had no visible impact on AMSC's stock price.   (R. 403 at 22.)

Massachusetts turbine owners suffered when Sinovel fled the United States to avoid accountability for its crimes. (PSR ¶¶ 50, 54-58; and R. 470, pp. 63-66, Shah trial testimony regarding Sinovel abandoning the maintenance agreements). Sinovel reasonably foresaw that the Massachusetts turbine owners would suffer losses: (a) for believing Sinovel's false statements and (b) when Sinovel abandoned its agreements to maintain and supply spare parts for the Massachusetts turbines.

The Massachusetts turbine owners losses are analyzed under either § 2B1.1, comment n. 3(A)(i), as reasonably foreseeable actual losses or under § 2B1.1, comment. n. 3(A)(v)(I), as a product substitution case. To the Massachusetts turbine owners, this is a product substitution case. Sinovel promised turbines *without* stolen intellectual property and delivered turbines *containing* stolen intellectual property. In such cases, the unwitting purchaser's losses include the "costs of making substitute transactions," "retrofitting the product so it can be used for its intended purpose," and "rectifying the actual or potential disruption to the victim's business operations caused by the product substitution." Except for two categories, discussed next, all of the Massachusetts turbine owners losses fall into these categories.

Two categories of harm that Sinovel caused, or likely caused, to the Massachusetts turbine owners are excluded from the § 2B1.1 loss calculation. First, as noted above, Seventh Circuit law directs that legal expenses should not be included in the § 2B1.1 loss calculations. *See Seward,* 272 F.3d at 839. Second, much of the financial harms suffered by Sumul Shah should not be included in the § 2B1.1 loss calculations as they result, not from the crime or relevant conduct, but from an inadequate foundation for the Charlestown turbine. *See* PSR ¶¶ 51-53. The

inadequate foundation may well be Sinovel's fault. However, the foundation issue is distinct from the crimes and relevant conduct. If, after all, Sinovel delivered inadequate specifications, the foundation would have presumably failed regardless whether the turbine used legal or stolen software. Unfortunately, since Sinovel fled from the U.S. in an attempt to avoid criminal accountability, it is also not present to face up to civil disputes regarding the foundation. The flight, however, is too tenuously linked to the foundation problems to bring losses related to the foundation into the § 2B1.1 loss calculation.

## III.    18 U.S.C. § 3663A Restitution

As noted in Section I above, under 18 U.S.C. § 3663A(a)(2) of the Mandatory Victims Restitution Act (MVRA), both AMSC and the Massachusetts turbine owners are victims entitled to restitution. However, because the MVRA does not provide restitution for consequential damages "that may ripple through the economy," the restricted ability of the towns of Scituate and Fairhaven to obtain power from the turbines, as described at PSR ¶ 58, does not make them "directly harmed" under the § 3663A(a)(2). *See United States v. Shepard,* 269 F.3d 884, 866 (7th Cir. 2001). It follows that the towns cannot obtain recovery under § 3663A.

Sinovel attempts to read § 3663A, the MVRA—and its responsibilities under the Act—narrowly. However, the "primary and overarching" purpose of the MVRA "is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Robers*, 698 F.3d 937, 943 (7th Cir. 2012) *aff'd*, 134 S. Ct. 1854 (2014) (further citation omitted). The MVRA compels a defendant to pay restitution to all victims for the offenses of

conviction. Further, where the offense of conviction "involves as an element a scheme, conspiracy, or pattern of criminal activity, the MVRA requires restitution to all harmed by the defendant's criminal conduct in course of the scheme, conspiracy or pattern. *See* § 3663A(a)(2); *Locke*, 643 F.3d at 247 (where the sentencing "court can demarcate the scheme, it can order restitution for any victim harmed by the defendant's conduct during the course of that scheme."); *Scalzo*, 764 F.3d at 745-46 (Restitution is due to any victim harmed in the course of an offense involving an element of scheme, conspiracy, or pattern). Sinovel was convicted of both conspiracy and a wire fraud scheme. Except for attorney fees and other consequential damages—which are disallowed, *United States v. Havens,* 424 F.3d 535, 538 (7th Cir. 2005), the crucial questions are (1) whether the defendant caused the loss and (2) whether the defendant's misconduct was the "but for" cause of the loss. *Scalzo*, 764 F.3d at 745. A victim's lost profits resulting from the defendant's wrongdoing are included in restitution. *Havens*, 424 F.3d at 537; *Shepard,* 269 F.3d at 866.

The Court finds the restitution amount by a preponderance of the evidence, *Orillo*, 733 F.3d at 244, and, as with the PSR loss figures, Sinovel must do more than simply deny the facts related to restitution, *see Scalzo*, 764 F.3d at 745.

While § 3663A and § 2B1.1 loss can be different, especially where the guideline loss is calculated on intended rather than actual loss, *see Orillo*, 733 F3d at 244; *Dokich*, 614 F.3d at 318-19; *Havens*, 424 F.3d at 538, that is not the case here. Based on the cases noted above, AMSC and the Massachusetts turbine owners are entitled to restitution for all the losses "countable" under § 2B1.1. MVRA restitution is also broad enough to cover loses that were occurred when a defendant's fraud caused the victim to enter into

15

contracts that they lost money through. *United States v. Robers*, 698 F.3d at 943. The MVRA "implicitly requires that the restitution award be based on the amount of loss actually caused by the defendant's offense." *Dokich*, 614 F.3d at 319. In *Robers*, the Seventh Circuit held that restitution was appropriate for banks who had entered into bad mortgage loans based on the defendant's conduct. The restitution amount was the money that the banks lost because of the foreclosures and resales into a declining restate market. *Id.* at 943. The court held that the defendant was responsible not only for the loss before the banks acquired the title to the foreclosed properties, but also the loss in value while the banks held the properties and attempted to sell them. *Id.* In *United States v. Shepard*, the Seventh Circuit held where money was fraudulently taken from an interest bearing account, that "[r]estitution should include interest to make up for the loss of the funds' capacity to grow." 269 F.3d at 886. These cases demonstrate that where a defendant promises the victim a profit, or even knows that a profit will be made on an agreement, they may be held responsible for that lost profit as restitution.

## IV. Sinovel's Misstatement Regarding Its Cumulative Cash Reserves

Sinovel told the Court's Probation Officer that it had approximately $95 million less in 2017 cash reserves than it told the Chinese stock market. (*See* Wang report and attachments). Sinovel's duplicity is galling but unsurprising. The conduct merits reproach in the form of a § 3C1.1 obstruction of justice enhancement. *See* § 3C1.1, comment. n. (4)(H)("providing materially false information to a probation officer in respect to a presentence [report]."). However, since the fine amount is capped at $1.5 million under *S. Union Co. v. United States*, 567 U.S. 343, 356 (2012), as noted below, adding more points to the guideline score is academic. Almost certainly, Sinovel tried

16

to make itself appear poorer than it is in hopes that the Court would limit the amount it is required to escrow for appeal under Fed. R. Crim. P. 38(c)(1) and (e)(2)(C).   Sinovel has abused the truth, the victims, and the U.S. judicial system long enough: if Sinovel wishes to go forward on appeal, it should be required to escrow the entire amount of the fine and restitution or, at minimum, the $95,038,388.72 in cash reserves it told the Shanghai Stock Exchange it had on hand in January 2018.

## V.   Fine Amount

Sinovel is correct that the statutory maximum fine in this case is $500,000 per charge because the jury did not make a finding as to the loss amount.   *See S. Union Co. v. United States*, 567 U.S. at 356 ("We hold that the rule of *Apprendi* applies to the imposition of criminal fines.").   Sinovel's guideline fine is thus capped at $1.5 million. The government requests that the Guideline fine be imposed given the scope of Sinovel's criminal conduct and the factors under 18 U.S.C. § 3553(a).

## CONCLUSION

For the foregoing reasons, this Court should adopt the PSR's findings as to the loss under § 2B1.1 and find that the actual losses to the victims are correctly calculated in the PSR with the exclusions noted above.   Further, subject to the exclusions noted above, the Court should order restitution be paid to the victims as noted above, and it should impose the maximum fine of $1.5 million.   Finally, the Court should direct Sinovel to escrow the entire amount of the fine and restitution or at least its $95,038,388.72 in cash reserves.

Dated this 26th day of June, 2018.

Respectfully submitted,

SCOTT C. BLADER
United States Attorney

By: /s/

_____

TIMOTHY M. O'SHEA
First Assistant United States Attorney

DARREN C. HALVERSON
Assistant United States Attorney

BRIAN L. LEVINE
Special Assistant United States Attorney
Senior Counsel, Department of Justice